UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GLENN A. HENKE and LINDA KLUNER, )
INDIVIDUALLY AND ON BEHALF OF    )
ALL OTHERS SIMILARLY SITUATED,   )
                                 )
        Plaintiffs,              )
                                 )
v.                               )        Case No. 4:10CV00086 HEA
                                 )
ARCO MIDCON, L.L.C., MAGELLAN    )
PIPELINE COMPANY, L.P., and      )
WILTEL COMMUNICATIONS, L.L.C.,   )
                                 )
        Defendants,              )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant Wiltel Communications,

L.L.C.'s Motion for Partial Summary Judgment, [Doc. No. 81]. Plaintiffs oppose

the motion.  For the reasons set forth below, the Motion is granted.

### Facts and Background

Don Palmer was designated as WilTel's corporative representative.  Palmer

is the Director of Field Operations of the Kansas City Division for Level 3

Communications. As to WilTel, Plaintiffs limit their definition of the subject

pipeline to only that portion of the pipeline which runs between Mexico, Missouri,

and Wood River, Illinois.  Level 3 purchased WilTel Communications in 2005.

Palmer's area of responsibility includes half of the segment from Mexico, Missouri to Wood River, Illinois. Palmer has worked for Williams Communications or WilTel since 1999. Williams Pipeline transferred a segment of the old Arco Pipeline to Williams Communications, which became WilTel. Williams Communications recognized that they were going to own that asset as early as 1999 prior to the actual document which put it into writing in February 2001. Williams Communications, now WilTel, knew that the use of the pipeline from 1990 through 1994 when it was sold to Williams Pipeline was that it was dormant and that it had been purged and laid in nitrogen. Being dormant and laid in nitrogen means that all of the petroleum liquid would have been drained or evacuated from the pipeline and a pig would have been pushed through it to push it all out, and then it would have been packed with nitrogen which is essentially "mothballing" the line to protect it. Plaintiffs urge that there is no document that confirms there was no petroleum remaining in the line.

WilTel was aware that in 1995 Williams Pipeline had ran another pig through it to ascertain whether there was draining involving petroleum liquids. WilTel is aware of documents and representation verifying that the petroleum was out of the pipeline in 1995. WilTel inquired if there was any knowledge about any spills before Williams Pipe Line owned the pipeline.

In 1999 another pig was run through the line to prepare it for fiber optic cable. Prior to WilTel putting fiber optic line cable into the pipeline, they needed to acquire an easement from the landowners. An additional easement had to be acquired because the easement rights in that corridor were for running refined petroleum products and WilTel needed communication rights in order to install a communication system. In order to acquire the additional easement, WilTel had to reach out to approximately 750 landowners to negotiate and pay to add communication rights to the corridor. The division of the company that went out and acquired the easements within Williams Communications was the right-of-way group within fiber services. Contact was made with landowners in various ways, including phone calls, letters, face to face, and town hall meetings. Eventually a signed document acquiring the rights was garnered from all of the landowners and fiber optic cable was put into the old Arco Pipeline. Approximately 750 landowners gave an easement to Williams Communications for fiber optic cable across the 107-mile span. Neither Williams Communications nor WilTel ever owned any other portion of the old Arco Pipeline. Palmer identified Exhibit No. 39 as one of the Right of Way Easement Agreements for communications rights in which the grantors or landowners gave an easement to Williams Communications were Margaret Tiemann, Herman Henke, Glenn A.

Henke, and Linda J. Kluner, f/k/a Linda Henke.  Exhibit 39, "Right of Way and Easement Agreement" is the same document produced by Plaintiffs in their Initial Disclosures and attached to their First Amended Class Action Complaint as Exhibit 100. Linda Kluner and Glenn Henke, the Plaintiffs in the instant lawsuit, signed Exhibit 39 in December,  1999.  Palmer identified the first full paragraph on page 2 of Exhibit 39 as containing the phrase "Any and all hazardous materials or conditions encountered during the installation, operation or maintenance of the underground communications system shall be fully remedied promptly by grantee."  The "any and all hazardous materials" paragraph  was not a standard paragraph that would be in a typical Williams Communications right of way easement agreement.  WilTel was aware of how that paragraph got into the right of way easement agreement that the Henkes signed; specifically, a series of 33 landowners jointly used an attorney who wanted that language inserted. Williams Communications accepted the inclusion of the language in the easement agreement of the 33 landowners represented by that attorney. WilTel has made a diligent search of all of the easement and right of way agreements to determine how many of the agreements have the "any and all hazardous materials" paragraph in them and of the 750, only 33 contain it.  All 33 of those landowners are in St. Charles County.

Fiber optic cable is placed in an existing pipeline by opening up a small section to the pipeline and inserting innerduct, which is a plastic conduit; the pipeline is opened up periodically to couple the reels of innerduct together; the installation of a fiber optic cable follows which is installed in three to five mile segments where the line needs to be opened up to splice the two sections of cable together. Records are kept during the installation process to determine the places that require excavation down to the pipeline for it to be opened up to insert the conduit; these are noted on maps in the form of handholds or splice points. Records were also kept to show points of excavation down to the pipeline in order to connect the fiber optic cable sections called splice points.  Opening up the pipeline means that excavation down to the pipeline needs to be done , breaking open the pipeline in order to have access to it by cutting it in half.  Other than installing innerduct and fiber optic cable, there are no other reasons in the installation process to do any excavation down to the pipeline. When the conduit is being installed in the pipeline, the frequency with which excavating down to and opening up the pipeline is required is approximately every three to five miles.

WilTel performed a search of the 33 landowners that had the "any and all hazardous materials" paragraph in their easement to determine how many properties Williams Communications or their contractors actually had to be on and

do some excavation. Of the 33 people with the "any and all hazardous materials" paragraph in their easement, Williams Communications or their contractors were actually on the property of nine of them during installation, with another three that straddled property lines. Only nine, plus potentially another three, out of the 33 easements which had the "any and all hazardous materials" paragraph were properties where Williams Communications was actually on the property during installation.

The actual installation of the fiber optic cable was done both by Williams Communications personnel and contractors. Williams Communications personnel supervised contractors doing the work. The closest point to Henke property where Williams Communications or its contractors were during the installation process on the west side of the property was approximately two and a half to three miles away. The closest point to Henke property where Williams Communications or its contractors were during the installation process on the east side of the property was at the southeast corner of Highway 94 and Saale Road. The Williams Communications crews and their contractors did not encounter any hazardous material or conditions during the installation process of the fiber optic cable. The Williams Communications crews and their contractors did not encounter any hazardous material or conditions at any place along the Mexico to Wood River

line during installation.

There has never been any maintenance work done on the Mexico to Wood River segment of the pipeline by WilTel. It does not matter to the use of the pipeline for fiber optic cable whether or not over the years the pipeline develops holes because the innerduct installed inside the pipeline is protecting the fiber. There has not been any maintenance on this segment of the pipeline by WilTel because there has never been a relocation required or a fiber cut where a repair has been needed. The operation of the fiber optic cable involves operation of the equipment which puts the light through the fiber optic cable, which is located at amplifier sites and add/drop sites in Kansas City and St. Louis, Missouri. WilTel monitors One Call volumes on a daily basis and interacts, with any contractors or landowners that are conducting any kind of invasive work around WilTel's systems. It is critically important to WilTel in the operation of the pipeline that people do not get into the fiber optic cable and break it, sever it, or damage it. WilTel has technicians that are responsible for locating their line if anyone is going to be doing any work in the vicinity of the buried cable.

In the State of Missouri there is a system called the Missouri One Call system which utilities subscribe to where an individual contractor calls one number

if they want to do some excavation and utility companies are notified as a result of the call. The agency then sends a ticket to anybody within the prescribed amount of distance from the location that is described for the activity.  When Williams Communications or WilTel gets a One Call notice from the Missouri One Call system, some of those can be cleared without even going out on the property just based on where the activity is going to be done.  Sometimes the activity is close enough that WilTel would need to go out and monitor the fiber optic cable and the activity. Specifically if it is close, WilTel would contact the individual and have further discussions. If warranted, WilTel would go out and locate the communications systems and either paint the ground or flag it so that the running line is known. In some circumstances WilTel would even stand there while the person is conducting their excavation activity. Locating and marking a line does not require any excavation.   Turning soil, excavating, backhoe operations, digging post holes, installing fence, are the types of activities that would require someone to call Missouri One Call.

Since Williams Communications has owned the segment to the pipeline which includes the Henke property, neither Williams nor WilTel is aware of anyone that called for a One Call on the Henke property.  Placing a line marker post would require Williams Communications to be on the property of landowners

along the segment. Placing a line marker would not require Williams Communications or their contractors to do any excavation.

Since Williams Communications has owned the Mexico to Wood River segment, other than the Green property, there has been no notification to Williams Communications that any landowner has detected contamination alleged to be on the pipeline. Since Williams Communications has owned the Mexico to Wood River segment, other than the Green property, there has been no notification to WilTel that any landowner has detected contamination alleged to be on the pipeline. There have never been any occasions after Williams Communications acquired the pipeline segment from Mexico to Wood River when hazardous materials or conditions were encountered during the installation, operation or maintenance of the fiber optic cable. Plaintiffs argue that Williams and WilTel have documents indicating unremediated contamination.

Plaintiff Glenn Henke is one of the two owners of the property referenced in the Complaint at the corner of Saale Road and Route 94 together with Linda Kluner, his sister. Mr. Henke and Ms. Kluner have owned the property since approximately 1993. Mr. Henke has never lived on the property. The approximate 78 acres are used for farm ground at present. Neither Mr. Henke nor his sister

personally farms the acres; rather they rent it out to a farmer, Gary Machens. The farmer has been growing corn and soybeans on the property. There is no written rental agreement between Mr. Henke and Mr. Machens. Mr. Henke is not aware of a written rental agreement with the person who farmed the property before the current farmer either. Mr. Henke is aware that there may be more than one pipeline running underneath his property. There is an area which Mr. Henke believes the county took for drainage on Mr. Henke's property at the corner of 94 and Saale Road. Mr. Hence believes he was present on his property between 8:00 A.M. and 1:00 P.M. on the day that SCI, a company retained by his attorneys, were present to conduct testing. Mr. Henke saw and smelled what looked to him like petroleum when they pulled up the soil samples from below the surface of the ground. Mr. Henke identified Exhibit 39 as the Right of Way Easement Agreement signed by him, his sister, his great-aunt, and his father in December of 1999. Mr. Hence believes he attended a meeting of landowners along the pipeline prior to executing Exhibit 39. Mr. Henke identified the "any and all hazardous materials" paragraph on the second page of the Right of Way Easement Agreement that he signed. Mr. Henke does not recall any conversations or observations that he made that Williams Communications' crews were on his property in connection with the installation of the fiber optic cable in the pipeline. Mr. Henke is not aware of Williams

Communications' crews or contractors actually being on his property during the installation of the fiber optic cable based on his personal observations or conversations that he had outside of his attorneys. Mr. Henke is not aware of any facts outside of what attorneys have told him to suggest that Williams Communications was on his property at the time of the installation of the fiber optic cable. Mr. Henke cannot recall any facts to suggest that Williams Communications was on his property. Mr. Henke does not know how fiber optic cable is installed in existing pipelines. Mr. Henke is not aware of anyone that owned property along Saale Road that actually had Williams Communications crews on their property during the installation of the fiber optic cable. Mr. Henke was aware that the pipeline that runs along Saale Road in front of his property had been taken out of service and had not had petroleum in it since 1990. Mr. Henke was aware that the pipeline that runs in front of his house formerly known as the Arco Pipeline had been taken out of service in the 1990s and had not had any petroleum introduced in it since 1990 by any company. He reports he smelled and saw very dark, dark, liquidy soil that had the appearance of oil, what he thinks was petroleum, when he was present on his property during testing conducted by SCI. Apart from this time, when he has gone to the property on just two or three occasions a year, just to look at it or drive by it, he has not seen anything that looks

like petroleum residue.  Other than the time that Mr. Henke was on his property with the technicians taking samples, he has never on any other occasion either before or since then smelled anything that smelled like petroleum.  Mr. Henke has never seen anything on his property that looked like petroleum or petroleum residue.  Mr. Henke has never tasted petroleum in any water either on his property or adjacent to his property. Mr. Henke is aware that there is a monitoring well placed close to or on his property.  Mr. Henke does not know whether this monitoring well is on his property or not. Mr. Henke believes he has never seen anyone on his property that he believes were either Williams Communications or WilTel personnel.  Mr. Henke believes he has never seen anyone on his property from Williams Pipeline Company either.  Mr. Henke has never seen anyone out on his property from Magellan Pipeline Company.  Mr. Henke is not aware of anyone else that had a Right of Way and Easement Agreement like Exhibit 39 with the "any and all hazardous materials" paragraph in it that actually had Williams Communications people on their property. Three years ago someone from a different pipeline company was on Mr. Henke's property doing some work.  Hence Mr. Henke believes it may be the case that there are active petroleum pipelines running across his property or along the edges of it. Mr. Henke does not recall whether anyone from WilTel or Williams Communications, either their employees

or contractors, ever doing any maintenance work on the pipeline than runs along Saale Road at any time while he has owned the property. Mr. Henke does not recall whether any WilTel or Williams Communications employee or any contractor for them doing any work or operating the fiber optic cable for any reason that involved were on his property during the time he has owned it. Mr. Henke is not aware of any WilTel or Williams Communications employee or contractor for either of them being on his property during the installation of fiber optic cable. There is no residence on the 78  acre property owned by Mr. Henke and Ms. Kluner.

Ms. Kluner does not know if a representative of Williams Pipeline was ever on her property at any time. Ms. Kluner does not know of any time any representative of Williams Communications were ever on her property at any time.Ms. Kluner does not know if any representative of Magellan Pipeline Company was ever on her property at any time.  Ms. Kluner did not report the alleged findings of SCI to any state or federal regulatory body.  Ms. Kluner did not report the alleged findings of SCI on her property to owners of the adjoining property.

Ms. Kluner occasionally drives by the property but typically does not get out and walk around on the property.  The property is mostly flat.   Ms. Kluner has never

seen, smelled, or tasted any petroleum at or on the property.  She has never drank

water from any source on her property and therefore cannot determine whether

petroleum could be tasted in the water.  Ms. Kluner identified her signature on

Exhibit 39, the Right of Way Easement Agreement with Williams

Communications.  Ms. Kluner identified the "any and all hazardous materials"

language in the first full paragraph of the second page of the Right of Way

Easement Agreement.   Ms. Kluner is not aware of Williams Communications or

WilTel ever being on her property during the installation of the fiber optic cable.

Ms. Kluner is not aware of any fact that suggests that Williams Communications or

WilTel was on her property at any time during the operation of the fiber optic

cable.  Ms. Kluner is not aware of any fact that would suggest that Williams

Communications or WilTel have done any maintenance or had to be on her

property in the maintenance of the fiber optic cable.   Ms. Kluner does not know

how fiber optic cable is put into former petroleum pipelines.  Ms. Kluner was

aware that no petroleum has been transported in the pipeline since 1990.  Ms.

Kluner believes it could be that  Williams Pipeline did not purchase the pipeline

until it was already out of service.  Ms. Kluner is aware that no one has put

petroleum into the pipeline since 1990.   Ms. Kluner believes that Williams

Communications and WilTel's use of the pipeline was not used for a petroleum

pipeline.  Ms. Kluner might have heard that there was  monitoring of the well near the northwest corner of her property. Ms. Kluner is not sure where the exact location of the well is including whether or not it is on her property.  Ms. Kluner determines where the western edge of her property is by looking at where the farmer has planted his crops.  Ms. Kluner has no information that anybody from Williams Communications or WilTel has been on her property.  Ms. Kluner is not aware of anyone who had property along the pipeline that runs in front of her property that have a document like Exhibit 39 including the "any and all hazardous materials" paragraph that actually had Williams Communications or WilTel personnel on their property.   There are no homes, residences, barns, buildings of any nature, or any confined spaces on Ms. Kluner's property at all.  Plaintiffs disclosed three persons as expert witnesses: 1) Royce Don Deaver, P.E. 2) Patrick Agostino, Ph.D., P.G., and 3) Jeff Langston, R.G.   Deaver was identified by Plaintiffs as an expert witness who may testify as to industry standards within the pipeline industry; prevention and cleanup of pipeline leaks and spills; regulatory standards and compliance requirements applicable to the pipeline industry; and liability of Defendants. Deaver has never worked in the telecommunication industry.  Deaver does not hold himself out as a telecommunication expert. Deaver is not familiar with all the local, state and federal regulations that dictate how

telecommunication companies operate their business. Deaver agreed that he is not offering any opinions in this case regarding WilTel and the current company that owns them, Level 3. Deaver understood that the only segment of the pipeline that is the subject of this litigation which has fiber optic cable in it is the segment from Mexico, Missouri to Wood River, Illinois. Deaver knew that the Mexico to Wood River segment did not have any products in it when it was purchased and had nitrogen in it and had been idle for a period of time. Deaver testified that there is no state or federal regulation that requires a telecommunication company to continue to have cathodic protection on a pipeline that is only being used as a conduit for fiber optic cable. Deaver agreed that the NFPA standard referenced in his report, specifically NFPA 329 concerning handling underground releases of flammable and combustible liquids, has no application whatsoever to fiber optic cable. Deaver agreed that the standards referenced by him in his report from the American Petroleum Institute have no application at all to either fiber optic cable or telecommunication deals. Deaver specifically refers to a 1972 American Petroleum Institute report titled the Migration of Petroleum Products in Soil and Groundwater. Deaver agreed that the API report Migration of Petroleum Products in Soil and Groundwater in Principles and Countermeasures would have no application to a conduit for fiber optic cable, if it were assumed that there has not been any

petroleum in the pipeline or easement since at least 1994. Deaver testified that industry  standards regarding petroleum pipelines and compliance with these industry standards by subsequent purchasers of the pipeline would not apply to WilTel. Deaver agreed that WilTel would have no duty to follow 49 CFR 195, DOT regulations concerning interstate petroleum pipelines and agreed that they do not apply to telecommunication companies. Deaver testified that WilTel would have no duty to maintain certain records required to be maintained by operators of petroleum pipelines.

The second person disclosed by Plaintiffs is Patrick Agostino, Ph.D., P.G., who Plaintiffs identified as an expert who may testify as to risks posed by pipeline leaks and spills; the movement of petroleum products in subsurface soil and groundwater;  industry standards within the pipeline industry;  testing, cleanup and remediation methods following pipeline leaks and spills; and liability of Defendants.  Agostino has never worked in the telecommunication industry. Agostino does not hold himself out as a telecommunications expert.  Agostino is not familiar with any of the local, state or federal regulations dealing with telecommunication companies. Agostino agreed he was not offering an opinion regarding WilTel's conformance with telecommunication rules or regulations. He also agreed that he is not giving an opinion that the federal regulations which

dictate how petroleum pipeline companies must operate pipelines have any application to fiber optic telecommunication companies.

The third and final person disclosed by Plaintiffs as an expert is Jeff Langston, R.G. Plaintiffs specifically indicated that his testimony will be limited to the methods  used and results obtained in subsurface testing on Plaintiffs' property located in West Alton, Missouri, in June 2010 and that he will be offering no other opinions in this case.   Langston is not an expert in the telecommunications field. Langston has never worked in the telecommunications field.  Langston has offered no opinions in the telecommunications field.

Robert M. Rohlfs, CPG, is an expert witness engaged by Defendants Magellan and WilTel in this matter.  Mr. Rohlfs holds a bachelor's and a master's degree in Geology. His experience includes managing multiple portfolios of sites with soil and ground-water impacts from released fuels and/or other chemicals. Mr. Rohlfs is familiar with the Henke property which is the subject of this litigation. Mr. Rohlfs reviewed the SCI Engineering, Inc., Subsurface Investigation of the Henke Tract Report dated July 2010 prepared by Jeffery Langston; the November 15, 2011, Transcript of the Testimony of Jeffery Langston; associated defendant's exhibits from the testimony of Langston; and the February 1, 2012, Transcript of

the Testimony of WilTel Communications, LLC, through its designated representative, Donald Richard Palmer. Mr. Rohlfs opinion is that all samples collected for laboratory analyses by SCI were from below grade, and that the location of petroleum compounds allegedly identified by SCI on the Henke tract was at least 2,000 feet away from the southeast corner of the intersection of Saale Road and MO Hwy 94. Given the distance, fiber optic installation crews working at the southeast corner of the intersection of Saale Road and MO Hwy 94 would not have encountered any petroleum compounds from the locations allegedly identified by SCI. No one walking the fiber optic line on the Henke property in the location of petroleum compounds allegedly identified by SCI on the Henke tract during the installation process or thereafter would have been able to detect such compounds below grade by sight, smell, or observation.

## Discussion

### Summary Judgment Standard

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

*Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The moving party has the burden to establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enter. Bank*, 92 F.3d at 747. Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Krenik v. Le Sueur* 47 F.3d 953, 957 (8th Cir. 1995). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)." *Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods v. DaimlerChrysler Corp.,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Maces. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity*

*Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The Court will review the facts in this case with the stated standards in mind.

WilTel moves for partial summary judgment on Counts VI (breach of contract) and Count III (negligence). WilTel argues that because it did not encounter any hazardous materials or conditions during the installation, operation, or maintenance of its underground communication system, Plaintiffs cannot establish a breach of contract. With regard to the negligence claim, WilTel argues that Plaintiffs cannot establish that WilTel owed them any duty and therefore, are unable to prove their negligence claim. Plaintiffs argue that considering WilTel's motion for partial summary judgment is premature, and further that there are disputed facts which preclude entry of partial summary judgment.

There is no dispute that under Missouri law, the essential elements of a breach of contract action are: a contract between the plaintiff and the defendant; rights of the plaintiff and obligations of the defendant under the contract; breach of the contract by the defendant; and damages suffered by the plaintiff because of the defendant's breach. *Teets v. American Family Mut. Ins. Co.*, 272 S.W.3d 455, 461

(Mo.App. E.D. 2008).

Plaintiffs argue that this motion is premature since it was filed before the Court ruled on the Motion for Class Certification. The Court agrees with Defendant that whether or not this matter has been certified as a class action is immaterial and irrelevant to the instant motion. While Plaintiffs are correct that the discovery in this matter has been separated with regard to class action issues and non-class action discovery, nothing precludes any of the parties from filing dispositive motions at any time. Indeed, the Court's Case Management Order recognizes that this may occur by denoting response times in the event motions are filed before the deadlines contained in the CMO.

With respect to the merits of the motion, Plaintiffs rely on the Right of Way and Easement Agreement with WilTel's predecessor, Williams Communications, Inc. Specifically, Plaintiffs' claim for breach of contract is premised on the paragraph which designates the Grantee (Williams) as the sole party to remedy hazardous materials or conditions encountered on the property during the installation, operation or maintenance of the underground communication system. This paragraph provides:

Any and all hazardous materials or conditions encountered during he

> installation, operation, or maintenance of the underground
> communications system shall be fully remedied promptly by the
> Grantee.

Exh. 39, at para. 113. WilTel's corporate representative, Don Palmer, explained

that the process for the installation of the fiber optic underground communications

system that is the subject of the contract requires excavation down to the pipeline

every three to five miles. Detailed records of these locations were kept. Of the 33

landowners with the above quoted provision in their easement, WilTel was on the

property of at most, twelve during installation. WilTel did not encounter any

hazardous material or conditions during the installation along the Mexico to Wood

River line, the line in which WilTel placed its optic underground communications

system, in spite of its vigilance in being observant for such conditions.

The undisputed facts establish that WilTel did not encounter any hazardous

materials or conditions during the operation of the underground communications

system. The operation involves operation of the equipment which puts the light

through the fiber optic cable, which is located at amplifier sites and add/drop sites

in Kansas City and St. Louis, Missouri.

Likewise, WilTel did not encounter any hazardous materials or conditions

during the maintenance of the underground communication system. The

undisputed facts establish that there has never been any maintenance work done on the Mexico to Wood River segment of the pipeline by WilTel.

Plaintiffs argue that WilTel did in fact "encounter" hazardous materials and conditions because Williams Communications, now WilTel, received documents from Williams Pipe Line Company that were related to the pipeline in 2001. These documents included evidence of prior leaks of petroleum products. From this, Plaintiffs argue that WilTel knew of the previous leaks and therefore encountered hazardous materials. Plaintiffs' strained reading of "encounter" in the contract is misplaced. As detailed in the Easements, "encounter" is the verb in the sentence dealing with the remedies. The Easement did not provide that WilTel would be responsible for remedying hazardous materials if it had any knowledge of or read about hazardous materials or conditions, rather, an affirmative action had to be experienced by WilTel in order for it to be responsible for the clean up. The verb, encounter, has the meaning of: "to have or experience (problems, difficulties, etc): to meet. . . without expecting or intending to." Merriam-Webster Online Dictionary; "a meeting, especially one that is unplanned, unexpected, or brief." The Free Online Dictionary. In order for WilTel to "encounter" hazardous material or conditions, it must have had some sort of experience, meeting, chance "running across." The undisputed facts establish that WilTel did not have "encounters" with

hazardous materials or conditions, in the ordinary meaning of the word, in the

installation, operation, or maintenance of the fiber optic cable in the pipeline

section from Mexico to Wood River.  As such, Plaintiffs cannot establish an

essential element of their breach of contract claim.  Summary Judgment on Count

VI in favor of WilTel is therefore appropriate.

Plaintiffs also argue that WilTel was negligent in its operation of the fiber

optic cable through the pipeline by failing to remedy the leaks of petroleum into the

surrounding land.

> Under Missouri law, a negligence claim consists of three elements: (1)
> a legal duty owed to the plaintiff by the defendant; (2) a breach of that
> duty; and (3) an actual injury to the plaintiff resulting from the
> defendant's breach. *Lopez v. Three Rivers Elec. Coop., Inc*., 26 S.W.3d
> 151, 155 (Mo.2000) (en banc). "Whether a duty exists is purely a
> question of law [,]" suitable for determination on summary judgment.
> *Id*.

*Aragon v. Wal-Mart Stores East, LP* 735 F.3d 807, 809 (8th Cir. 2013).

To determine whether Plaintiffs' negligence claim can survive summary

judgment, the Court first must determine whether WilTel owed a duty to Plaintiffs.

Defendant argues that because Plaintiffs did not designate an expert with regard to

the specific type of relationship between Plaintiffs and WilTel, a tele-

communications company, they cannot establish the existence of a duty between

Plaintiffs and WilTel.  The Court agrees.  In order for a determination of whether a

duty exists, the Court, in this instance, looks at circumstances surrounding the

parties' relationship.

> "A duty to exercise care can be imposed by a controlling statute or
> ordinance, assumed by contract, or imposed by common law under the
> circumstances of a given case." *Bowan v. Express Med. Transporters,*
> *Inc*., 135 S.W.3d 452, 457 (Mo.Ct.App.2004). In determining whether
> a duty exists in a particular case, Missouri courts consider several
> policy factors, including the foreseeability of the harm. Id. Whether a
> duty exists is a question of law. *Id.*

*Bluehaven Funding, LLC v. First American Title Ins*., 594 F.3d 1055, 1060 (8th

Cir. 2010).  Plaintiffs contend that WilTel was negligent in allowing the continued

leakage of petroleum products onto their land, however, it cannot be ascertained

from these allegations alone whether WilTel should be responsible for any

petroleum leakage based on the fact it ran fiber optic cable through the pipeline,

and did not encounter any hazardous material or conditions.  Plaintiff's allegations

of a duty alone are insufficient to convince the Court that a duty exists.  Without

some evidence that WilTel should be held accountable for the leakage based on its

operations and its relationship to Plaintiffs, the Court cannot find that a duty to

Plaintiffs existed.  Plaintiffs have presented nothing to establish such a duty, and

therefore, as a matter of law, the Court finds WilTel owed no legal duty to

Plaintiffs.  Summary Judgment in favor of Defendant as to Count III is appropriate.

## Conclusion

Based on the foregoing analysis, summary judgment is proper in favor of Defendant WilTel and against Plaintiffs on Counts III and VI of Plaintiffs'

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Wiltel Communications, L.L.C.'s Motion for Partial Summary Judgment, [Doc. No. 81], is granted.

A separate judgment in accordance with this Opinion, Memorandum and Order will be entered upon the resolution of the remaining claims herein.

Dated this 7th day of March, 2014.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE