UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GLENN A. HENKE and LINDA KLUNER    )
INDIVIDUALLY AND ON BEHALF OF      )
ALL OTHERS SIMILARLY SITUATED,     )
                                   )  Case No. 4:10CV86 HEA
              Plaintiffs,           )
                                   )
v.                                  )
                                   )
ARCO MIDCON, L.L.C., MAGELLAN      )
PIPELINE COMPANY, L.P., and        )
WILTEL COMMUNICATIONS, L.L.C.,     )
                                   )
              Defendants.            )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for Class Certification

[Doc. No. 98].  A Class Certification Hearing has been  conducted in the matter

and the motion has been briefed and argued. For the reasons set forth below, the

Motion for Class Certification is denied.

## FACTS AND BACKGROUND

The following facts are taken from the Plaintiffs' complaint, as well as the

affidavits and other evidence submitted by the parties in briefing the motion for

class certification.

Plaintiffs bring this putative class action seeking recovery for damages to

property that Plaintiffs allege they and the putative class members incurred as a

result of Defendants' ownership, maintenance and control of a pipeline and easement on or beside the properties.

The pipeline is a segment of a former petroleum pipeline owned by a predecessor of Defendant ARCO Midcon, LLC – ARCO Pipeline Company – from 1950 to 1994. The segment runs from Mexico, Missouri to Wood River, Illinois[1]

Over several decades, the pipeline was laid, repaired, reconditioned, mothballed, and ultimately converted to a conduit for telecommunications cable. ARCO Pipeline Company operated the pipeline as a petroleum pipeline for decades until 1990, when it began the process of packing and purging it, i.e., mothballing the pipeline, by removing all petroleum products and pressurizing it with nitrogen. After the pipeline was mothballed, a process that was completed by the end of 1990, it was never again used to transport petroleum products. In 1994, ARCO sold the pipeline to Williams Pipe Line Company, n/k/a Defendant Magellan, as part of a larger transaction involving other pipeline segments. Beginning in 1999, the pipeline segment was prepared for and ultimately had fiber optic cable installed in it. In 2001, the pipeline segment was sold to Defendant

---

[1] By their Motion to Amend By Interlineation, Plaintiffs have their limited their claim to this segment of the pipeline.

WilTel, a telecommunications company that currently uses the pipeline to house its fiber optic network.  WilTel acquired communication rights from all of the landowners along the segment.

The 1994 "Pipeline Sale and Purchase Agreement Between ARCO Pipe Line Company and Williams Pipe Line Company" ("the PSA,") contained an exhibit titled: "ARCO Pipe Line Company – Products Spills for Assets Being Sold To Williams – APL Retained Environmental Liabilities – Exhibit 10.4."  Exhibit 10.4 is a list of remediated leaks for which ARCO agreed to retain liability.  It lists leaks by pipeline segment, including segments which are not part of Plaintiffs' allegations. It was compiled by ARCO's Safety, Health, and Environmental Protection group ("SHEP") and identifies a list of prior leaks known to the seller, ARCO, for which ARCO agreed to remain responsible. Exhibit 10.4 does not indicate specific property locations for the identified leaks.  For example, a typical entry under the column "Name of Line, Nearest Town, County," would be "Wood River to Mexico 8", 4 Miles East of Peruque, MO, St. Charles County."

Plaintiffs Glenn A. Henke and Linda Kluner together own a tract of land along the pipeline. They allege that there is contamination on their property. There are several additional active and inactive petroleum pipelines that run across the Plaintiffs' property.  Plaintiffs' experts indicate there is some contamination on

Plaintiffs' property, but do not opine as to its source or the extent – specifically they do not offer any opinion that this contamination came from the old ARCO pipeline.

Plaintiffs' experts do not provide evidence of contamination at any other property in Missouri along the old ARCO pipeline other than Plaintiffs' property and one other parcel.[2]

Defendant ARCO contends that it monitored its pipeline for spills and leaks.

Plaintiffs claim that widespread contamination from this pipeline presently exists. This claim is primarily based on internal documentation from ARCO that Plaintiffs claim demonstrates the existence of past leaks.

The 1994 PSA between ARCO and Williams and its Exhibit 10.4 lists past leaks that Defendants assert were remediated.  ARCO represented and warranted to Williams at the time of sale that it was a complete and accurate list of past leaks that had been remediated.  ARCO was aware of all the releases on Exhibit 10.4 and represented in the Pipeline Purchase and Sale Agreement that it had complied

---

[2] Since the sale of the old ARCO pipeline from ARCO to Williams in 1994, there has been one lawsuit by another landowner claiming contamination from the old ARCO pipeline. These landowners are neither plaintiffs nor putative class members here, and the associated litigation did not result in a judicial determination of the source of any contamination on the property.

with and was operating the old ARCO pipeline within all the necessary laws and regulations. Plaintiffs have not yet identified any duty or regulatory requirement that Defendants keep records of how leaks were addressed and cleaned up, and Defendants maintain that not even current operators are required to do so. Exhibit 10.4 itself is not a leak report – it is a summary list of leaks. Exhibit 10.4 contains several column headings, including: "Report No.," "Leak Date," "Name of Line, Nearest Town, County," "Product," "Leak Cause," "Bbls Out," and "Bbls Rec." The column heading "Report No." gives the corresponding break and leak report numbers. For additional information, one would need to look at the corresponding break and leak report with that number. Plaintiffs' experts reported that they were shown examples of break and leak reports.  Former ARCO employee Mr. Dooley identified six break and leak reports prepared by him. These leak reports contain information more specific than Exhibit 10.4 about where the leak occurred, when, and what was done to repair the leak and clean it up. The information on these six break and leak reports corresponds to six entries on Exhibit 10.4 and can be identified by matching the report number from the left-hand column on Exhibit10.4 to the report number on the upper right corner of the break and leak report.

Other records referenced by Plaintiffs include several separate form

documents which in some instances indicate that they are for settlement in full for all damages to the real and personal property of undersigned, or similar language. Other documents state that they are for damages caused by repairing, reconditioning, relaying, and the like.

ARCO (and prior operators) generated leak reports and maintenance reports related to the cleanup of a leak or spill from the pipeline. The "break and leak" reports were an initial report on a leak. Maintenance reports were follow-up reports reflecting additional activity such as replacing pipeline, repairing pipeline, excavation, removal of petroleum products, etc.  Plaintiffs define their proposed classes based on the non-existence of "break and leak" reports for property with a leak or spill record.  Plaintiffs exclude those properties for which a "break and leak" report has been produced from their proposed classes.  Defendants assert that Exhibit 10.4 shows that these records were generated and did exist, for it was assembled from "break and leak" reports: the column heading "Report No." corresponds to specific break and leak report numbers.

The petroleum industry is a highly regulated industry. The Department of Transportation requires operators of petroleum pipelines to keep ten types of records. As ARCO's expert Mesavage observed, the recordkeeping and document retention requirements set forth in 49 CFR 195 were all promulgated after 1980.

Defendants assert that these document retention requirements do not include any requirement to retain cleanup or remediation records from prior pipeline leaks. Defendants note all of these requirements are directed to the operator of a pipeline. Neither WilTel nor Magellan was ever an "operator" of the old ARCO pipeline – that is, they never operated the pipeline to transport petroleum. Thus, according to WilTel and Magellan, they could not have generated such records – and were not required to keep them even if they came into possession of them.

The absence of documents, Defendants maintain, is not unusual given the long time spans involved, the differences in documentation standards, the relocation of records, the changes in ownership, and the resulting loss and damage to records that occurs as a result of these factors.

Count I of Plaintiffs' Amended Complaint is brought under a theory of nuisance against ARCO only. Count II is brought against all Defendants for trespass; Count III, against all Defendants for alleged negligence; and Count VI against WilTel only for breach of contract.

Plaintiffs seek to bring these claims as a class action, proposing the following class definitions, in pertinent part:

a. Regarding Counts I, II, and III:

All persons who currently own property on which there is a record

indicating that there is a leak or spill of petroleum products or other pollutants or chemicals from the Eastern Segment of the "Pipeline" and for which there is no break and leak report identifying remediation. The Eastern Segment of the "Pipeline" is defined as the portion from Mexico, Missouri to the Missouri-Illinois border, near West Alton, Missouri.

b. Regarding Count VI:

All persons who contracted with or whose predecessors in land ownership contracted with Williams Communications (n/k/a Wiltel) by signing a copy of the "Right of Way and Easement Agreement" attached to this Complaint as Exhibit 2000, who currently own property on which there is a record indicating that there is a leak or spill of petroleum products or other pollutants or chemicals from the Eastern Segment of the "Pipeline" and for which there is no break and leak report identifying remediation. The Eastern Segment of the "Pipeline" is defined as the portion from Mexico, Missouri to the Missouri-Illinois border, near West Alton, Missouri. […]

Based on these proposed definitions, Plaintiffs ask this Court to certify a "testing class" under Rule 23(b)(2); a "liability class" under Rule 23(b)(3); or alternatively an "issue class" under Rule 23(c)(4).

## CLASS CERTIFICATION STANDARD

Under the Federal Rules of Civil Procedure, "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the interests of the class."

Fed.R.Civ.P. 23(a). The four Rule 23(a) requirements applicable to all class

actions are more commonly referred to as: (1) numerosity (a class so large that

joinder of all members is impracticable); (2) commonality (questions of law or fact

common to the class); (3) typicality (named parties' claims or defenses are typical

of the class); and (4) adequacy of representation (representatives will fairly and

adequately protect the interests of the class).   *Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 613-14 (1997). To initiate a class action, a group of Plaintiffs must

establish that the filed case meets all of these requirements. *See Wal-Mart Stores,*

*Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)("A party seeking class certification

must affirmatively demonstrate his compliance with the Rule—that is, he must be

prepared to prove that there are in fact sufficiently numerous parties, common

questions of law or fact, etc.").  Courts should not suppress "doubt" as to whether

a Rule 23 requirement is met—no matter the area of substantive law. *In re*

*Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 321 (3d Cir. 2009).

     If a plaintiff is able to sufficiently demonstrate that they can meet the

requirements of 23(a), he or she can then maintain the class action by establishing

that the case fits under 23(b). The applicable sections cited by the Plaintiffs here

are 23(b)(2)("the party opposing the class has acted or refused to act on grounds

that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole"), and 23(b)(3)(" the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.")

To determine whether a plaintiff has met the requirements of Rule 23, the Supreme Court has recognized that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," … and that certification is proper only if '"the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. . . ("'[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable").  *Wal-Mart*, 131 S. Ct. at 2551-52 (internal citations omitted). The court's initial "inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005); *see also Wal-Mart*, 131 S. Ct. at 2551-52 ("Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. "'[T]he class determination generally involves

- 10 -

considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' ") "Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Id.* Whether or not a plaintiff has met its burden of demonstrating that it has satisfied the requirements of both Rule 23(a) and one of the categories of Rule 23(b) "necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims." *Id.* at 568-69.

There are three related threshold requirements found by implication in Rule 23(a) which should begin any analysis of a putative class: (1) that a class must exist; (2) that the representative parties are members of the class; and (3) that at least one named class representative has Article III standing. *Bynum v. District of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003); *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 877 (D.S.D.1982); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir.2000).

The first of these related requirements, that a class must exist, is interchangeably referred to as ascertainability or identifiability. "If a class is so vague that it is not susceptible to ready identification, problems may arise

regarding the provision of notification to class members, the binding effect of any judgment rendered in the case and the general concerns of propriety of an overly large class." *See Ad Hoc Committee to Save Homer G. Phillips Hosp. v. City of St. Louis*, 143 F.R.D. 216, 219 (E.D.Mo. 1992).  A proposed class may not be defined in such a way as to make the actual composition of the class only determinable at the conclusion of the proceedings.  *In re Paxil Litigation,* 212 F.R.D. 539, 545 (C.D.Cal.2003); *see also, McElhaney v. Eli Lily & Co.,* 93 F.R.D. 875, 877-88 (D.S.D.1982).  A class should not be certified unless the class description is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Kirkman v. N. Carolina R. Co.*, 220 F.R.D. 49, 53 (M.D.N.C. 2004)(*quoting* 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1760 (3d ed.2005)). Certification is not appropriate where the court would be required to engage in fact-intensive individualized analysis to identify class members. *Adair v. Johnston*, 221 F.R.D. 573, 577-79 (D.Ala.2004); *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y.2001); *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir.1981). Additionally, the inability to ascertain which particular plaintiffs belong in the class makes it difficult for the Court to determine whether requirements such as numerosity and typicality are met. *In re Paxil Litigation*, 212 F.R.D. at 545.

The second requirement is that, inherent in Rule 23, is the requirement that the class representatives are members of the class, and a proffered representative cannot represent the class where they cannot maintain their own claim. *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 n. 8 (8th Cir. 1996); *Great Rivers Co-op. of S.E. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 899 (8th Cir. 1997); *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1196-97 (8th Cir. 1998).

Finally, it is well-settled that at least one named class representative must have Article III standing to raise each class subclaim. *Prado-Steiman*, 221 F.3d at 1279; *see also Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 577 (M.D.Fla.2006). The constitutional requirements of Article III standing are well known. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, there must be a causal connection between the injury and the conduct complained of, i.e. the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561, 112 S.Ct. 2130.

- 13 -

Plaintiffs' foundational theory that no record of a cleanup means it did not occur is incorporated into their class definitions, bringing into question administrative feasibility.  Plaintiffs propose two slightly different definitions based on their substantive legal theories, but they include the identical phrase: "for which there is no break and leak report identifying remediation."  Plaintiffs' Motion raises questions as to their ability to meet all three of  Rule 23(a)'s threshold requirements.

First, Plaintiffs' class definitions go beyond a level supported by the evidence, for this presumes that remediation records are restricted only to "break and leak reports." Further, this definition raises the potential need for fact-intensive individualized analysis to identify class members. This Court would have to conduct an inquiry regarding each person on Plaintiffs' Exhibit 1 in order to ascertain whether such a record could be found and correlated with their property. Defendants have demonstrated that some records indicating prior remediation do exist, both in the form of "break and leak reports" and tract file documents alternately referred to as payment slips, damage receipts, and settlements.  Further, Plaintiffs' Exhibit 1 fails to correlate any of the names and properties on it to any "record indicating that there is a leak or spill…" as their proposed class definitions require. Finally, Plaintiffs' representative samples of

"payment slips" reveal that they are not necessarily leak or spill records. Significant fact-intensive individual analysis would be required to evaluate membership in Plaintiffs' proposed classes.

Second, Plaintiffs have not sufficiently established that they are members of the classes they seek to represent because they have not come forward with evidence that they own property with a record of a leak or spill from the old ARCO pipeline; or evidence that WilTel breached a contract with them.

Plaintiffs define their proposed classes as persons "who currently own property on which there is a record indicating that there is a leak or spill of petroleum products or other pollutants or chemicals from … the [old ARCO pipeline]." However, as evidenced by Plaintiffs' Exhibit 1, purportedly a list of such persons, they do not meet this definition and are not members of the classes they describe, as Plaintiffs' names do not appear in the document.

Plaintiffs have made no showing that they have sustained any injury in fact, they have no proof of causation, and thus they lack standing to bring suit in their own right.  Plaintiffs claim contamination on their property but all experts agree that they do not know its source. An allegation of contamination alone is not a cognizable injury.

Plaintiffs also allege trespass, but to establish a claim for trespass, "the

- 15 -

pollution must be at a level so as to constitute an actual interference with the possession of the land." *Williams v. Monsanto*, 856 S.W.2d 338 (Mo. App. 1993). Moreover, a claim for trespass encompasses an element of causation, i.e., did any actions of defendant *cause* a trespass?  See *Kinealy v. Southwestern Bell Telephone Company*, 368 S.W.2d 400, 402 (Mo. 1963). "[T]respass involves interference with the plaintiffs' possessory rights and requires an intentional act that results in a physical invasion of the plaintiffs' property." *Cook v. DeSoto Fuels, Inc.*, 169 S.W.3d 94, 102 (Mo. App. E.D. 2005). Here, Plaintiffs allege that contamination from leaks or spills of petroleum products constitutes the trespass. Yet, the evidence demonstrates that the alleged spills or leaks all occurred prior to Magellan or WilTel's respective ownership of the old ARCO pipeline, and that neither of them ever used the pipeline to transport petroleum products. No action on their part can be described as an intentional act that resulted in a physical invasion of Plaintiffs' property.

Plaintiffs are landowners who do not occupy their property. They have never lived on it. Rather, they rent it out, and farming is the only use of the property. There is no residence or even a structure on the property. They do not claim any interference with their use of the land. As Defendants' expert Rohlfs explained, no petroleum compounds detected by the SCI testing exceed MDNR's

Tier 1 criteria for construction worker exposure or any non-residential pathways for current land use. Further, the alleged contamination on the Henke property is not able to mobilize, i.e., it cannot migrate anyplace else, given its location and low concentration. Consequently, the mere apprehension of speculative future injury is insufficient to satisfy the Article III injury-in-fact requirement.  *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 650 (S.D. Ala. 2005).

## THE FOUR EXPLICIT REQUIREMENTS OF RULE 23(A)

### Rule 23(a)(1): Numerosity

Rule 23(a)(1) requires an inquiry into whether the class is so numerous that joinder of all members is impracticable. *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559 (8th Cir. 1982). Factors relevant to this inquiry include the number of persons in the proposed class, although no arbitrary rules regarding the necessary size of classes have been established. *Id.*  Moreover, the number of persons in the proposed class is merely one of several factors. The court may also consider the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members. *Id.* at 559-60. Courts have held that the geographical dispersion of class members is among the factors which may be considered in determining numerosity – that is, whether the individuals affected could be simply

joined into one cause of action, rather than proceeding as a class. Cf. *Morgan v. United Parcel Service of America, Inc.*, 169 F.R.D. 349, 355 (E.D.Mo. 1996)(finding joinder impractical where potential class members were dispersed throughout the eleven UPS regions in the United States); and *Gries v. Standard Ready Mix Concrete, L.L.C.*, 252 F.R.D. 479, 486 (N.D. Iowa 2008)(finding insufficient geographic dispersion where substantially all of the proposed class members lived within the boundaries of the judicial district). Finally, Courts have also considered the fact that the members of a prospective class are able to be identified when contemplating whether joinder is impracticable and a class action required. *Gries*, 252 F.R.D. at 486 (finding that since the plaintiff could contact each class member, joinder was not impracticable).

Here, Plaintiffs have offered themselves as the single willing participant, asserting that they have satisfied the numerosity requirement because they have listed 250 properties in their Exhibit 1. However, as to any individual property, Exhibit 1 neither meets nor makes reference to half of Plaintiffs' proposed class definitions – first, a record of a leak or spill – or second, no corresponding remediation record.

Further, as to their contract cause of action Plaintiffs have not identified any current class numbers, and based on the evidence presented, the proposed class

cannot possibly exceed twelve.

As to the geographic considerations, Plaintiffs' entire proposed class is contained within the boundaries of the Eastern District, and Plaintiffs, through framing of the proposed classes, have demonstrated an ability to contact the prospective class members they have identified.

## Rule 23(a)(2): Commonality

The commonality determination "requires a plaintiff to show that there are questions of law or fact common to the class." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-51 (2011). As the Supreme Court has observed, that language is easy to misread, because any competently crafted class complaint literally raises common "questions." *Id.* at 2551. Merely reciting questions is not sufficient to obtain class certification; rather, commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Id.* Further, the claims must depend upon a common contention which must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. *Id.* The *Wal-Mart* Court quoted Professor Nagareda to explain:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of

- 19 -

> the litigation. Dissimilarities within the proposed class are what have
> the potential to impede the generation of common answers.

*Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84

N.Y.U.L.Rev. 97, 132 (2009)).

Plaintiffs pose multiple questions, suggesting that the existence of these

questions satisfies the commonality requirement of Rule 23(a). These questions do

not demonstrate similarities between members of the proposed classes. Plaintiffs

do not provide any proof of a classwide injury, where they offer only themselves

as an example and provide insufficient evidence to link even their own claims to

the old ARCO pipeline. But even if they had provided such evidence for

themselves, Plaintiffs have not demonstrated that the determination of damages on

their own property has any bearing on whether the same damage would have

resulted on all or even one of the other class members.

For instance, Plaintiffs' Motion highlights the pervasive individualized

questions here, e.g.: "whether unremediated leaks from the subject pipeline remain

in soil and groundwater." This is not a question that can be answered on a

classwide basis. Whether or not any given property has any contamination and

whether or not it was from the old ARCO pipeline is not one question, but

multiple questions. Plaintiffs' questions include allegations which have no

bearing on ultimate issues, for example, "whether defendants have a policy in place to respond to old petroleum leaks." Others are of the type criticized by the Supreme Court in *Wal-Mart*: "Do all of us plaintiffs indeed work for Wal-Mart?" and "Whether Exhibit 10.4 [a list of prior petroleum leaks] constitutes evidence of prior petroleum leaks." Another example of a question the Supreme Court identified as having no bearing on ultimate issues is: "What remedies should we get?" At least four of Plaintiffs' questions fit this description, e.g., "Whether Class Members are entitled to damages."

But most importantly, the proposed class list does not include evidence which would demonstrate that any or all of their members can (or will be able to) answer the crucial two-part question to determine whether they have been injured and should be included: "does my property have any contamination, and if so, is it from the old ARCO pipeline?"

Additionally, the nature of Plaintiffs' claim precludes satisfaction of the commonality requirement. In *Kirkman v. North Carolina R. Co.*, 220 F.R.D. 49 (M.D.N.C. 2004), a suit alleging trespass in the installation of fiber optic cable across North Carolina was found to lack commonality because it included issues such as the nature of the defendants' property interest in each of the disputed rights-of-way, the property interest of each potential class member in the right-of-

way at the time of the alleged trespass, and the possibility of statute of limitations

defenses for some class members. *Id.* at 52. All of these same problems exist here.

In *Kirkman*, the court found that by its nature as a property dispute, the inquiry

was necessarily an individual one, requiring a preliminary legal determination for

each potential class member before the Defendants' conduct is even relevant. *Id.* at

52-53. The same complexities prevent a finding of commonality in this case as

well.

The Eighth Circuit defines typicality as requiring "a demonstration that

there are other members of the class who have the same or similar grievances as

the plaintiff." *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269 (8th Cir. 1990). A

demonstration of typicality requires a plaintiff to demonstrate something more

than general conclusory allegations that prospective class members have suffered

the same injury as the plaintiff. *Paxton*, 688 F.2d at 562. A typicality analysis

necessarily involves a comparison of the plaintiffs and the prospective class

members. Thus, it is incumbent upon the plaintiff to submit sufficient evidence for

the court to conclude that prospective class members do, in fact, share in the

plaintiff's claims. *TBK Partners v. Chomeau*, 104 F.R.D. 127, 131 (E.D.Mo.

1985). Conversely, if the parties seeking to represent the class have claims or

defenses which are not shared by the proposed class members, then the class fails

for lack of typicality. *TBK Partners*, 104 F.R.D. at 131. This point is illustrated by the *Burkhead* case, where plaintiffs were residents of areas surrounding a power plant who sought monetary and injunctive relief for damage allegedly resulting from fallout and noxious odors. *Id.* 250 F.R.D. at 289. The Court rejected plaintiffs' motion for certification for failure to meet the requirement of Rule 23(a)(3), typicality, because the proposed representative plaintiffs did not represent "an adequate cross-section" of the proposed class. *Id.* at 295. The Court so concluded because plaintiffs' geographic concentration made it unlikely that their property damage claims would be "typical" of those that might be brought by individuals elsewhere in the sizeable proposed class area. *Id.*

The typicality requirement also is not met where there is an apparent conflict between a plaintiff's requested relief and those of potential class members. *TBK Partners*, 104 F.R.D. at 131.

Here, Plaintiffs fail to meet both tests for typicality. First, Plaintiffs offer only conclusory allegations that landowners along the old ARCO pipeline have unremediated leaks, without presenting evidence showing that any class member (including Plaintiffs) has unremediated contaminated property with the pipeline as the source. Plaintiffs offer less than the statistical analysis deemed insufficient in

*Chaffin* to demonstrate the existence of a class with the same or similar claims. Their expert Deaver performed no statistical analysis – offering only speculation. Plaintiffs also failed to support their assertion that there is documentation of prior petroleum spills on their property, much less have they linked the alleged contamination on their property to the old ARCO pipeline.

Plaintiffs also offer no basis for comparison of their claims across the class – only conclusory allegations that assume prospective class members are similar. There is no specific comparison of Plaintiffs to any prospective class member in terms of their use or ownership of the land, the circumstances surrounding their grievances, or the relief they may seek. Other members of the proposed class live in areas subject to completely different influences, meaning that the factual and legal issues of other proposed class members' claims could differ dramatically from one to the next. The nature and extent of each alleged site of contamination is dependent upon numerous factors that are unique to each site and the individual release. One plaintiff's property may involve shallow ground water while another site may not involve ground water at all. One site might involve a very large release while another site may have had a very small release volume. One site might have had contamination from a crude petroleum product while another site might involve a refined petroleum product. Another site might involve significant

natural resources while another site may not. Land use varies from site to site. One site may have exceeded a cleanup standard set by the MDNR, while another site may not. Some plaintiffs may allege only property damage; other plaintiffs might allege economic loss or even personal injury. Most significant however is that causation is not typical across the Plaintiffs' proposed classes.

Thus, the existence – much less the nature and extent – of any classwide contamination is entirely speculative, Plaintiffs fail the typicality requirement because the nature and extent of the potential contamination alleged for each putative class member would be unique.

Second, Plaintiffs create a conflict between their requested relief and those of potential class members by proposing a mandatory (b)(2) "testing class," for "[t]he Rule provides no opportunity for … (b)(2) class members to opt out…." *Wal–Mart*, 131 S.Ct. at 2558. Granting Plaintiffs the injunctive relief they seek would force all putative class members to submit their private property to testing and cleanup activities as prescribed by Plaintiffs and limit their right to determine future use of their land – a level of unanimity which cannot be presumed.

As to the breach of contract claim, the evidence presented shows that Plaintiffs' easement is atypical of easements along the fiber optic communications cable and does not contain a claim that is applicable across the class.

**Rule 23(a)(4): Adequacy**

The adequacy of representation requirement under Rule 23(a)(4) seeks to discover conflicts of interest between named representatives and the class they seek to represent. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). A class representative must be part of the class, possess the same interest, and suffer the same injury as the prospective class members. *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Additionally, several courts have found that a plaintiff proposing to be a class representative cannot adequately do so where that plaintiff has voluntarily foregone personal injury claims. *See Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 296 (2008). These courts have repeatedly held that the failure to seek full recovery by splitting out personal injury, property damage, and/or injunctive relief claims creates a significant conflict of interest destroying adequacy of representation. *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203-04 (W.D. Tex. 2004); see also *In re MTBE 2002*, 209 F.R.D. at 340.

The *Burkhead* court explained that under applicable state law, plaintiffs who wished to pursue property damage claims on behalf of the entire proposed class also would have imposed upon the entire proposed class their decision to give up any personal injury claims that could be asserted against defendants.

- 26 -

The *In re MTBE 2002* plaintiffs also failed to establish adequacy under Rule 23(a)(4) due to concerns over claims-splitting of plaintiffs lacking personal injury claims. 209 F.R.D. at 338-41.  More generally, where plaintiffs have purported to represent two classes who allegedly suffered wrongs that plaintiffs apparently had not, they have been deemed inadequate representatives. *Homer G. Phillips*, 143 F.R.D. 216 at [9] (no pinpoint cite available). Missouri adheres to the principle that a single wrongful or negligent act which causes injury to both the person and property of the same individual constitutes only one cause of action but with separate items of damages. *Collins v. Burg*, 996 S.W.2d 512, 515-16 (Mo. App.E.D. 1999).  Such a cause action cannot be split; and a judgment in an action for recovery for one item of damage will bar a separate action to recover for the other item. *Id.*

Here, Plaintiffs assert claims only for injunctive relief and property damages, not personal injury. As they state: "[t]he proposed Class is seeking damages only arising out of property damage claims."  Thus, because Plaintiffs assert claims only for property damage, they are not adequate representatives and their proposed classes fail to meet this requirement.

## RULE 23(B)(2) REQUIREMENTS

Class certification under Rule 23(b)(2) is proper only when the primary

relief sought is declaratory or injunctive. *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121-22 (8th Cir. 2005). Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries, so the claims must be cohesive. *Id.*  The key to whether or not a (b)(2) class should be certified is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 131 S.Ct. at 2557.  As the Supreme Court put it, "at a minimum, claims for individualized relief … do not satisfy the Rule." *Id.* Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. *Id.* The Rule does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant; and neither does it authorize class certification when each class member would be entitled to an individualized award of monetary damages. *Id.* The Supreme Court also pointed out that the Rule "does not require that class members be given notice and opt-out rights, presumably because it is thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause." *Id.* at 2559.

 *In re MTBE 2002*, 209 F.R.D at 343-44applied the  principle that as

injunctive relief is not appropriate with respect to the class as a whole, where the existence of individualized issues such as differences in the level of contamination, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require. The court noted specific factual issues such as plaintiffs with contamination levels below state guidelines, the need for investigation at each site to characterize the source of contamination, etc. *Id.* at 344.  Since the existence of these issues destroyed cohesiveness, no injunction could be sufficiently specific to provide a group-wide remedy. *Id.* An injunction seeking remediation of contaminated wells was too broad. *Id.* at 345.

Finally, certification under Rule 23(b)(2) can only be had under the plain language of the rule when the injunctive relief sought will be "*final* injunctive relief." The word "final" in Rule 23(b)(2) refers to the nature of the relief, and not merely the finality of the order entered. See *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 576-77 (7th Cir. 2008). Courts reject the use of Rule 23(b)(2) as an evidence-gathering tool to facilitate an award of damages. *Kartman v. State Farm Mutual Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011); *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 573 (7th Cir.2008); *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978 (5th Cir.2000). In *Kartman*, the Court specifically rejected an injunctive

class which would have required classwide reinspections at the expense of the defendant to determine whether damage had been sufficiently addressed in the past. 634 F.3d at 892. The Court found that such injunctive relief is neither "final" nor "appropriate" under the language of the rule. *Id.*

Here, it is the requisite cohesiveness is lacking since Plaintiffs are not primarily seeking injunctive relief with their "testing class." The nature of Plaintiffs' requested relief is primarily for damages, not injunctive relief. Plaintiffs seek the cost of restoration and cleanup of their property and eleven other enumerated types of compensatory, consequential and incidental damages. Plaintiffs do not even specifically request exploratory testing in their prayer for relief. However, they now seek to characterize their "testing class" as having the purpose of funding exploratory testing. But testing and remediation are not injunctive relief – these costs are quantifiable as monetary damages. Plaintiffs' proposal would impermissibly shift the cost of discovery of damages onto Defendants.

Plaintiffs have failed to demonstrate or define a need for an injunction from this Court spanning five counties in Missouri.  The purported need for testing is not indivisible. The test is not whether the relief could be applied to the whole proposed class, it is whether it can only be applied to the whole class or none of it.

Nothing prevents Plaintiffs or any other landowner from conducting testing on their own property to establish the existence or source of contamination. Nothing prevented Plaintiffs from conducting self-limited testing on their own property. Plaintiffs were able to do so without an injunction compelling 250 landowners to submit to testing as well.

Furthermore, the disparate factual circumstances of class members have been found to prevent a class from being cohesive and, therefore, make the class unable to be certified under Rule 23(b)(2). *Gates*, 655 F.3d at 264. Plaintiffs may not shift the inherent shortcomings of the class action device onto Defendants.

Further, Plaintiffs' proposed injunction is not final: "[o]nly this testing can identify any and all properties that are contaminated…." Their experts admit that the extensive testing they propose will be insufficient to determine the source and/or alternative sources of any contamination found, as well as other unresolved issues. Even if the extensive testing reveals any contamination, it would not produce any finality or resolve any classwide issues.

## RULE 23(B)(3) REQUIREMENTS

Plaintiffs claim that the instant action is also maintainable under (b)(3). A class action may be maintained pursuant to Rule 23(b)(3) where "the court finds that questions of law or fact common to the members of the class predominate

over any questions affecting only individual members, and that a class action is

superior to other available methods for the fair and efficient adjudication of the

controversy." Fed.R.Civ.P. 23(b)(3). In deciding whether a class is maintainable

under Rule 23(b)(3), this court must consider "the interest of the members of the

class in individually controlling the prosecution or defense of separate actions"

and "the difficulties likely to be encountered in the management of a class action."

*Id.* The issue of manageability of a proposed class action is always a matter of

justifiable and serious concern for the trial court and peculiarly within its

discretion. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d124, 140-41.

(2d Cir.2001). The overwhelming majority of courts refuse to certify mass tort

actions brought pursuant to Rule 23(b)(3). *In re MTBE 2002*, 209 F.R.D. at 349.

**Predominance**

Based on the predominance requirement of Rule 23(b)(3), courts deny

certification where individualized issues of fact abound. See, e.g., *In re LifeUSA*

*Hldg., Inc.*, 242 F.3d 136, 144-46 (3d Cir.2001); *Neenan v. Carnival Corp.*, 199

F.R.D. 372, 375 (S.D.Fla.2001). A claim is not appropriate for class treatment

where it requires individualized, fact intensive inquiry into facts and

circumstances unique to each putative class member. *Blades v. Monsanto*, 400

F.3d 562, 569-72 (8th Cir. 2005); see also *Amchem Prods. v. Windsor*, 521 U.S.

591, 624-25 (1997). Simply showing that common questions of law or fact may exist is insufficient to satisfy Rule 23(b)(3)'s predominance requirement. *Smith v. Brown & Williamson Tobacco*, 174 F.R.D. 90, 94 (W.D. Mo. 1997). The standard for certification imposed by Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 624; *In re Genetically Modified Rice Litig.*, 251 F.R.D. 392, 397 (E.D. Mo. 2008).

While there are many individualized questions presented by Plaintiffs' claims, the overwhelming predominant issue is: what is the cause of any discovered contamination? This issue is incapable of classwide resolution where Plaintiffs propose a class stretching across hundreds of different properties in five counties, spanning over a hundred miles. Plaintiffs assert that liability can be resolved for the entire class with a trial on common issues, leaving only damages to individual hearings. However, Plaintiffs have not identified common questions that are capable of predominating over the myriad individual inquiries which would remain, including:

- whether a petroleum release in fact occurred on a particular property;

- whether a particular property is contaminated;

- the source of any actual release or contamination on a particular property (e.g. other active or dormant pipelines, other land uses unrelated to pipelines);

- the proximate cause of a release on a particular property, including whether it was caused by the pipeline operator, the landowner, or a third party such as an adjacent landowner, a utility, or contractor (for instance striking the pipeline during excavating or farming activities);

- whether remediation or clean-up activities were taken in response to any alleged leak or release, by whom, and at what time, or whether remediated at a later time;

- the level of remediation required, permitted or authorized (by the property owner or a governmental agency) at the time of alleged release;

- whether a current or prior property owner declined remediation at any point in time, or whether any payments were made to a property owner in lieu of remediation;

- whether any subsequent events may have affected a property;

- the extent to which any original contamination has been resolved through natural attenuation;

- the damages, if any, sustained by each particular property owner; and

- affirmative defenses, including the significant statute of limitations issues that are presented.

Common questions do not predominate over individual questions in this matter because the nature of the evidence Plaintiffs would need to offer to resolve the questions described above varies from class  member to class member, and from property to property. As such, Plaintiffs' ability to satisfy the predominance requirement of Rule 23(b)(3) is obviated by the very nature of Plaintiffs' claims.

**Multiple different events in multiple locations over a long time**

- 34 -

*In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002), concerned multiple actions by well owners in four states who alleged that their wells were contaminated, or were in danger of being contaminated, by MTBE. *Id.* at 329. The court found that the proposed class did not meet the requirements of Rule 23(b)(3). *Id.* at 350. The court began its analysis by noting that the overwhelming majority of courts refuse to certify mass tort actions brought pursuant to Rule 23(b)(3). *Id*. at 349. The court also distinguished cases cited by the plaintiffs before it as well as Plaintiffs here, on the grounds that those class representatives had alleged a single accident, caused by a single or few actors who released the chemical within a specific geographic location. *Id.* at 349-50. That is not this case. In *In re MTBE 2002*, factors including the existence of third parties, the differing degree of contamination from property to property, and the nature and extent of damages and relief were all found to depend on site-specific examination, thus destroying predominance. Such factors are on all fours with the facts of this case.

> The Third Circuit distinguishes single events as well:
>
> Not all claims of property damage based on exposure are alike. Single instances or simple theories of contamination may be more apt for consolidated proceedings than extensive periods of contamination with multiple sources and various pathways.

*Gates v. Rohm & Haas Co.*, 655 F.3d 255, 271 (3d Cir. 2011).

*Gates* involved plaintiffs seeking class certification of a class of village residents including a class for compensation for property damage from alleged vinyl chloride exposure under theories including negligence and trespass. *Id.* at 258, 271. In *Gates*, the court found that common issues did not predominate because of the potential differences in contamination on the properties and rejected plaintiffs' motion for class certification under Rule 23(b)(3). *Id.* at 272, 274.

Likewise, in *Reilly v. Gould, Inc.*, 965 F.Supp. 588 (M.D.Pa.1997) residents of an area surrounding an industrial plant sued for lead exposure, seeking certification of a property damage class. The court refused to certify a property damage class due to "the presence of additional individualized factors affecting individual plaintiffs which wreaks havoc on the notion that all plaintiffs' injuries have been caused solely by the defendant's actions." *Id.* at 602. The court noted that the impact of exposure would have to be analyzed on a property by property basis. *Id.* at 605. That property by property analysis would be further complicated here by the lack of a centralized group of putative class members.

The instant case fits with those described above: the alleged period of contamination nears almost a century; the alleged leaks span over a hundred miles of the old ARCO pipeline; and Plaintiffs' own property demonstrates the existence

of multiple sources and pathways such as other pipelines.

Plaintiffs rely exclusively on authority based on single event and single location incidents where classes have been certified.   However, when considering multiple events in different locations over long periods of time, courts have recognized that these types of suits are ill-suited to the class action device. Even more specifically, class action certification has been rejected under these circumstances in the setting of alleged environmental contamination.

The lack of any single, operative event or conduct that may have "caused" injury to each individual plaintiff renders this case extremely ill-suited for class resolution. Courts have recognized the difficulties inherent in certifying a class in mass tort cases and product liability cases, which, like this case, present numerous individual inquiries. But this case, unlike "mass tort" cases, also lacks a single "event" or conduct that suggests some common evidence of liability.

If there was a single release of petroleum from a pipeline affecting large numbers of plaintiffs, it may be possible to litigate issues such as: where did the release come from; who caused or contributed to cause it; etc. But here, there is no single "happening" or conduct that Plaintiffs can point to or rely upon as proof of a common proximate cause or single set of operative facts. This is particularly true given that Plaintiffs seek relief against three different Defendants, all of whom

played a different role at different times, and against whom different claims are asserted. Although Plaintiffs' Motion for Certification attempts to group all defendants together, the multiple defendants will necessarily have varying degrees of liability, if any. Significant differences exist as to what each entity did, what each entity knew, what duties (if any) each entity owed, what actions each entity took, and which property owners were affected by each.

**The existence of contamination, causation, and damages**

In *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273 (S.D.Ala.2006), the plaintiffs requested certification of a class of owners of property within an approximately 2.1 mile radius of a chemical manufacturing facility, seeking damages for diminution in property values. *Id.* at 276-77. The court rejected plaintiffs' motion for certification for a failure to satisfy Rule 23(b)(3). *Id.* at 302-310. The *Fisher* court found that individual proof substantially outweighed common proof, in summary:

> Any theory of liability predicated on intrusion of … contaminants on a plaintiff's property (e.g., nuisance, trespass, negligence) finds common issues being overwhelmed by individual issues for four reasons, to-wit: (a) individual proof will be necessary to show the existence of contamination; (b) individual proof will be necessary to show the causation of any observed contamination; (c) individual proof will be necessary on the issue of damages; and (d) individual proof will be necessary to assess defendants' limitations defense.

*Id.* at 306-07. Regarding the first of these, the court noted that common proof

would not show that any given plaintiff's property was, in fact, contaminated. *Id.*

at 307. As to the second, the court explained that causation would unquestionably

be an individual-specific enterprise, as the mere presence of a chemical at a

location says nothing about causation for purposes of holding a defendant liable.

*Id.* at 307.

In *LaBauve*, the court rejected the plaintiffs' motion for class certification

under Rule 23(b)(3) for failure to meet its predominance requirement, focusing on

the need for individualized damages calculations, combined with the numerous

liability and limitations issues requiring plaintiff-by-plaintiff scrutiny. 231 F.R.D.

at 678. The court noted numerous fundamental issues that would demand

individual-specific resolution, including: "[w]hether a plaintiff's property is

contaminated, the source(s) of such contamination, the extent of such

contamination, the cause and timing of harm, and the resulting damage (measured

in diminution of property value)." *Id.* at 673. Based on these issues, the *LaBauve*

court concluded that plaintiffs would still need to introduce extensive

individualized proof or argue substantial individualized legal points to establish

most of the elements of their claims. *Id*. The Court illustrated its point in the

context of the trespass claim, noting that elements concerning causation and

damages would require substantial individualized proof and legal argument even if plaintiffs proved all common issues regarding a history of releases of toxic materials by the defendant. *Id.*

As to the third reason why the *Fisher* court found that individual proof substantially outweighed common proof, computation of damages to property will inevitably be a property-specific enterprise here. The *Fisher* court observed that while this reason is frequently noted as not being sufficient in and of itself to preclude a finding of predominance, where significant individualized questions going to liability coincide as well, the need for property-specific damages calculations will militate strongly against certification under Rule 23(b)(3).

In *Steering Comm. v. Exxon Mobil*, 461 F.3d 598, 602 (5th Cir. 2006), the Court recognized that "separate types of proof would be necessary for … property damage, devaluation, and business loss claims." The Court further held that where "individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class," class certification is likely improper. *Id.* These issues will "require plaintiff-by-plaintiff scrutiny" and "will remain unanswered in a class proceeding." *Gates v. Rohm & Haas*, 265 F.R.D. at 233.

Individualized proof of contamination (injury), causation, and damages

- 40 -

would be necessary for the negligence and trespass counts plead against Defendants here. These claims would require claimant-specific proof of the essential elements for each claim, including: (I) is a particular property contaminated?; (2) what was the source and/or cause of the contamination?; (3) whether there are any damages to each particular property, e.g. the amount of remediation required, loss of value, diminished use or enjoyment of the property, and any other compensatory losses suffered by individual property owners.

Plaintiffs acknowledge this problem by seeking to shift the burden of demonstrating classwide petroleum contamination to Defendants by their "testing class." And, as in *Burkhead*, "what remains missing is any evidence that the *cause* of the entire class's damages could be determined in a single proceeding." (emphasis in original). 250 F.R.D. at 299. For each property owner, as a threshold matter, Plaintiffs will need to establish contamination, or actual injury. Plaintiffs neither offer nor even suggest any common proof that can establish that all putative class members in fact have contaminants on their individual properties. Evidence of contamination will vary from class member to class member and from property to property. There is also no common evidence of source, or cause.

While common evidence may offer one potential source of contaminants, many other explanations may exist that are specific to a particular property. But

Plaintiffs offer only their own property as an example – albeit one that illustrates this problem, for their property includes other potential sources – other pipelines, including pipelines which are currently transporting petroleum products.

Plaintiffs present evidence of contamination on their own property (but not the source or cause of that contamination) and even if there was evidence that the old ARCO pipeline was the source, this evidence would only be applicable to their property alone, and could not be used to establish any other property owner's claim in the proposed "liability class." Even if Plaintiffs were permitted to proceed to trial, and it was judicially determined that the old ARCO pipeline was the source, it would not be a determination of a common issue because it would have no application to any other property. Causation is individual to each putative class member. Plaintiffs' experts acknowledge that similar testing would need to be conducted on each property – an expansive and costly process in and of itself – which would only establish either the lack of or presence of contamination at each site. Then, even if actual contamination is found on a particular property, Plaintiffs must still further establish that the source of such contamination was the old ARCO pipeline and still further, attributable to some conduct of one of the Defendants. Plaintiffs' experts acknowledge that more extensive and more expensive testing would be required at each site to determine the source, extent,

and many other salient details of any contamination found. Such individualized proof of contamination and causation render class treatment ineffective.

Plaintiffs seek unspecified monetary damages for: loss in property value, the cost of restoration and clean-up of a property, for "loss of use" of a property, for "annoyance and discomfort" to each property owner, for loss of business opportunity to a property owner, for loss of rental value for a particular property, for decreased marketability of the property, and other economic or "non-economic" losses. All of these claimed damages are specific to each individual property owner and each individual property, and are not subject to any classwide proof. There is no reasonable "formula" that can be used to assess damages. Rather, a property-by-property, claimant-specific assessment must be made. Additional individual issues exist, including whether a particular property owner remediated the property or will consent to any proposed remediation. Plaintiffs seek monetary damages and classwide remediation, yet an individual property owner may have already declined or may choose to decline remediation.

Claims that Defendants were negligent, caused leaks, or may have failed to clean them up during varying periods and types of ownership of the pipeline over decades is insufficient to maintain a class, as the questions of causation, maintenance, operation, and actions taken by each pipeline owner will need to be

addressed for each individual leak, at each discrete point in time for the old ARCO pipeline. Nor can Plaintiffs simply claim that some general pattern by Defendants of "failing to maintain" the old ARCO pipeline or "failing to investigate" past leaks led to or caused all of these individual events, without offering proof as to the cause and alleged negligence of each leak. Exhibit 10.4 is just one illustration of the various "causes" for each of the leaks identified therein, e.g. "external corrosion," "equipment failure," and "third party." Many of Plaintiffs' claims do not even apply to Magellan or WilTel, who never operated the pipeline. The same is true for Plaintiffs' trespass claims. Each property will require an individual assessment, and the same issues of causation, contamination and injury are still present.

**Affirmative defenses**

The fourth reason *Fisher* held that common issues were overwhelmed by individual issues was the existence of affirmative defenses. The *Fisher* court found that disparate, individualized assessment of a statute of limitations issue may cause individual considerations to predominate, especially where plaintiff-specific timeliness defenses could reasonably be expected to become a focal point of the litigation, overshadowing common issues and negating the benefits of the class certification mechanism. *Id.* at 309-10.

Defenses such as the statute of limitations, mitigation or affirmative release of claims will require an individualized determination for each class member because these defenses turn in large part on each class member's knowledge and conduct, or a prior owner's knowledge and conduct.

The individual issues raised by affirmative defenses can "clearly" preclude certification. *Barnes v. Am. Tobacco. Co.*, 176 F.R.D. 479, 502 (E.D. Pa. 1997); *see also In re Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d at 853 (individual issues may outnumber common issues where affirmative defense "may depend on facts peculiar to each plaintiff's case"). As noted in *Barnes v. Am. Tobacco Co.*, 175 F.R.D. 479, 502 (E.D. Pa. 1997), "the individual issues that are involved in determining whether affirmative defenses and the statute of limitations apply to each and every plaintiff" can be "staggering" and preclude certification. In *Barnes v. Am. Tobacco Co.*, 175 F.R.D. 479, 502 (E.D. Pa. 1997), the Court noted that in determining a limitations defense, it would "have to examine when plaintiff's injury accrued, and whether plaintiff knew or should have known of the injury and its cause" which the Court recognized was "clearly an individual issue." In *LaBauve*, the court cited limitations issues (i.e., "…when each plaintiff knew or should have known of the alleged contamination...") among other problems requiring plaintiff-by-plaintiff scrutiny in concluding the plaintiffs had failed to

meet Rule 23(b)(3)'s predominance requirement. 231 F.R.D. at 673, 678.

Likewise here, the Court would have to examine when a putative plaintiff's injury accrued, whether a plaintiff knew or should have known of the injury, as well all the notice or knowledge of all prior property owners. Further, with respect to the affirmative release of claims defense, the Court will need to examine whether a property owner provided a release and the scope of such release. Here, the individual issues for each affirmative defense would be complex and require an individual assessment for each and every putative class member.

**Breach of contract**

Plaintiffs offer no common proof to establish a "classwide breach," as they would need to show whether defendant WilTel breached its contract vis-a-vis the individual signatory to each contract. This type of claim requires proof – in each instance for each particular property – first, the threshold issue of whether that particular tract of land was in fact contaminated, and then, that WilTel actually "knew" of such contamination and failed to live up to its contractual obligations. There is no potential for common or classwide proof as to WilTel's independent actual knowledge of actual contamination on a particular piece of land. WilTel's liability to the entire class for breach of contract cannot be established with common evidence. See *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir.

2003) (denying certification for breach of contract claim where individualized extrinsic evidence would be needed and liability could not be established on classwide basis).

**Superiority**

Rule 23(b)(3) also requires Plaintiffs to prove the proposed action "is superior to other available methods for fairly and efficiently adjudicating the controversy." This analysis "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

As discussed above, there are simply too many individualized inquiries relating to liability and damages to suggest that a class action is the superior method for handling this litigation. The collective presentation of individual liability evidence will not advance the parties' interests, nor will judicial economy of administration result from certification. The "missing link, causation [and contamination], will have to be proved in the case of each plaintiff before other individual issues such as damages can be reached." *See Caruso v. Celsius Insulation Resources, Inc.*, 101 F.R.D. 530, 535-537 (M.D. Pa. 1984). Given the numerous individualized factual and legal issues that exist here, the Court would be faced with the classic case of having a lengthy series of "mini-trials" for each

claim and for virtually every element of those claims. See, e.g., *In re Genetically Modified Rice Litig.*, 251 F.R.D. 392, 399-400 (E.D. Mo. 2008) (class action not superior where case would "devolve into an endless series of 'mini-trials' that would fail to meet the goals of class certification.")

There would be no gain in judicial efficiency by conducting the individual trials which would still be necessary if this case were certified and reached the fourth and final step proposed by Plaintiffs.  Hundreds of property owners would receive notices about the litigation just before that step.   At that point all of the predominant individual issues would still remain. Because there is no common proof of negligence or causation, each class member would still have to establish at a minimum (1) his or her geographic connection to the old ARCO pipeline and/or an identified leak; (2) conclusive evidence demonstrating actual contamination on the property; (3) evidence that the contamination, if any, on their property was attributable to the old ARCO pipeline (and for the period of time it was in operation), and (4)it  specifically was attributable to some action taken by one of the Defendants. The litigation would immediately devolve into a series of mini-trials for each class member and each instance of a leak.

There is also no way to determine the identity of class members without individualized inquiry. Plaintiffs seek to have an injunction entered against all

- 48 -

Defendants ordering them to test each putative class member's property to determine if there is contamination – after a class has already been certified.

Plaintiffs have not come forward with evidence that property along the old ARCO pipeline has been affected classwide. Plaintiffs have not identified common issues of liability leaving only damages for mini-trials. There would be no increased efficiency under Plaintiffs' proposal, for the litigation would still comprise an unavoidable series of mini-trials on multiple issues other than and including damages. Plaintiffs offer no evidence that leaks remain in the soil across a widespread area. Their proposed classes are not superior to individual litigation, and due to the many individual mini-trials necessitated by the nature of their claims and the nature of the evidence they will need to present, cannot be feasibly managed by the Court. Separate trials held outside of the class action device would not be repetitive due to the multiplicity of unique issues here. Accordingly, Plaintiffs cannot show that class treatment would be an efficient and superior means for handling this litigation.

## "ISSUE CERTIFICATION"

The Eighth Circuit has previously declined to choose a side in what it characterized as a "conflict of authority" as to whether a class can be separately certified as an "issue class" under Rule 23(c)(4). *In re St. Jude Med., Inc.*, 522

F.3d 836, 841 (8th Cir. 2008)(citing cases on both sides of the split). At issue is whether "issue certification" is permitted as a separate fourth avenue for certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3), where Plaintiffs otherwise fail to meet the requirements of Rule 23(b)(3).

Having considered these authorities, this Court concludes that the better reasoned approach is found in *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir.1996), where the Fifth Circuit rejected an attempt to avoid the predominance requirement of Rule 23(b)(3) by seeking certification pursuant to Rule 23(c)(4):

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for trial ... Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

*Castano*, 84 F.3d at 745, n. 21. In this Court's view, absent authority within this Circuit's precedent indicating otherwise, Rule 23(c)(4) should not be used as a separate avenue for certification and will not certify a class based upon it.

## CONCLUSION

Certification of the classes which Plaintiffs attempt to define would be

unprecedented. Plaintiffs have no evidence of contamination on their property from the old ARCO pipeline, much less widespread contamination across five counties and over a hundred miles. They have asked the Court to certify one class and order defendants who never placed any petroleum in the pipeline to fund a massive speculative testing project. Even though the results of this testing project would not reveal the source of anything found, Plaintiffs then propose a second class based upon it.

For the following reasons, Plaintiffs' Motion for Class Certification is denied: (1) Plaintiffs have failed to show that an ascertainable class exists, that they are members of the class, and that they have standing; (2) Plaintiffs' claims fail to satisfy the numerosity requirement of Rule 23(a)(1); (3) Plaintiffs' claims fail to satisfy the commonality requirement of Rule 23(a)(2); (4) Plaintiffs' claims fail to satisfy the typicality requirement of Rule 23(a)(3); (5) Plaintiffs' claims fail to satisfy the adequacy requirement of Rule 23(a)(4); (6) Plaintiffs' proposed "testing class" does not primarily seek final injunctive relief as required by Rule 23(b)(2); (7) Plaintiffs' proposed "liability class" does not raise questions of law or fact that predominate over individual issues, and is not a superior method of adjudication as required Rule 23(b)(2); (8) finally this Court declines to recognize Rule 23(c)(4) as a separate avenue for certification where other requirements are

not met.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification,

[Doc. 98], is **DENIED**.

Dated this 12th day of March, 2014

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE